IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CONSERVATION LAW FOUNDATION<br>62 Summer Street<br>Boston, Massachusetts 02110<br><br>     *Plaintiff*,<br><br>  v.<br><br>WILBUR ROSS, in his official capacity<br>as Secretary of Commerce,<br>United States Department of Commerce<br>1401 Constitution Avenue NW<br>Washington, DC 20230<br><br>NATIONAL OCEANIC AND ATMOSPHERIC<br>ADMINISTRATION<br>United States Department of Commerce<br>Room 5128<br>1401 Constitution Avenue NW<br>Washington, DC 20230<br><br>CHRIS OLIVER, in his official capacity<br>as Assistant Administrator for Fisheries,<br>National Marine Fisheries Service<br>1315 East-West Highway<br>Silver Spring, MD  20910<br><br>NATIONAL MARINE FISHERIES SERVICE<br>United States Department of Commerce<br>Room 14555<br>1315 East-West Highway<br>Silver Spring, MD  20910<br><br>     *Defendants*. | Civil Action No. _____ |

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.      Plaintiff Conservation Law Foundation ("CLF") on behalf of its adversely affected members hereby challenges the unlawful decision of the National Marine Fisheries Service ("NMFS") to approve and implement Framework 59 to the Northeast Multispecies Fishery Management Plan, because, among other things, it failed to establish measures necessary to rebuild Atlantic cod stocks to healthy levels as mandated by the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1884 ("Magnuson-Stevens Act" or "the Act"), and violated the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").  CLF requests this Court to remand Framework 59 and require NMFS to establish new management measures that conform to the Magnuson-Stevens Act as expeditiously as possible and by a date certain.

## INTRODUCTION

2.      Massive shoals of Atlantic cod once inhabited the coastal waters off the northeastern United States and Canada.  Their abundance was legendary; historical accounts describe being able to catch cod simply by dipping a basket in the water.

3.      For centuries, cod was a major driver of the regional economy in New England and Eastern Canada, and the stocks seemed limitless.  Even as fishing pressure increased through the 1800s, Thomas Huxley, a prominent fisheries scientist famously declared the cod population to be "inexhaustible."

4.      Ecologically, Atlantic cod (*Gadus morhua*) is a high level predatory fish native to cold-water marine ecosystems in the North Atlantic.  Atlantic cod was a foundational species in North Atlantic coastal ecosystems for millennia, constituting a substantial portion of the total biomass and playing a primary role in transferring energy up the food chain.

5.      Today, the Gulf of Maine and Georges Bank cod stocks—the two stocks of Atlantic cod under U.S. jurisdiction and management—are severely depleted and persist at only a fraction of their former sizes, due primarily to unsustainable fishing pressure.

6.      Under the Magnuson-Stevens Act, NMFS has a mandatory duty to rebuild fisheries in a time period that is "as short as possible" taking into account various factors and "not [to] exceed 10 years," except where the biology of the stock, environmental conditions or an international agreement dictate otherwise.  16 U.S.C. § 1854(e)(4)(A).

7.      Federal scientists for decades have found that both Atlantic cod stocks are subject to overfishing (meaning the rate of removals is too high) and are overfished (meaning the population abundance is at an excessively low level).  Yet NMFS has continued to approve actions that end up failing to stop overfishing and failing to rebuild cod stocks as required by law.  These failures have resulted in continued harm to the species.

8.      Framework 59 to the Northeast Multispecies Fishery Management Plan is the most recent action by NMFS to set conservation and management

3

measures for Atlantic cod and implement the stocks' rebuilding plans.  *See* 85 Fed.
Reg. 45,794 (July 30, 2020) (final rule); New England Fishery Management Council,
Northeast Multispecies Fishery Management Plan Framework Adjustment 59 (Apr.
10, 2020) ("Framework 59").

9.     Framework 59 provides an extraordinarily clear example of how
NMFS has implemented the rebuilding requirement in the Northeast region so as to
read it entirely out of the Act.  Atlantic cod stocks have been under formal
rebuilding plans for decades, yet in Framework 59 NMFS authorized conservation
and management measures that undisputedly cannot rebuild Gulf of Maine cod by
the deadline of 2024.  And for Georges Bank cod, there is nothing in the record and
no rational basis to support the conclusion that this stock will rebuild by its 2026
deadline if managed under the Framework 59 conservation and management
measures.

10.    Framework 59, moreover, rests on arbitrary and capricious decision-
making that fails to comply with other requirements of the Magnuson-Stevens Act
and the relevant regulatory framework.

11.    These violations of the Magnuson-Stevens Act and the APA harm CLF
and its members' interests in healthy Atlantic cod populations and in protecting and
restoring the species' role in the marine ecosystem.  This harm will continue in the
absence of action by this Court.

12.    Plaintiffs request that this matter be advanced for hearing at the
earliest opportunity, pursuant to 16 U.S.C. § 1855(f)(4).

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this case pursuant to the Magnuson-Stevens Act, which provides that the "district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Act, 16 U.S.C. § 1861(d), and explicitly anticipates judicial review of regulations and fishery management actions, *id.* § 1855(f).

14.     The Court also has jurisdiction over this case pursuant to the APA, which allows courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), and to "compel agency action unlawfully withheld," *id.* § 706(1).

15.     The Court further has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

16.     The Court has authority to grant the requested relief pursuant to the Magnuson-Stevens Act, 16 U.S.C. §§ 1855(f), 1861(d), and the APA, 5 U.S.C. § 706(1)-(2), as well as the provisions of 28 U.S.C. §§ 2201-2202 (providing for declaratory and injunctive relief).

17.     The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

18.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(e)(1)(A)-(B), and 5 U.S.C. § 703, because Defendants reside in this judicial district, and because

a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## PARTIES

19.     Plaintiff CLF is a non-profit membership organization dedicated to, among other things, protecting marine wildlife and their habitats as well as other coastal and ocean resources in New England.

20.     To further these goals, CLF undertakes litigation and other advocacy on behalf of its members' interests; educates its members on conservation issues and on threats, challenges, and solutions for New England's oceans so that they can exercise their rights and protect their interests in those resources; promotes public awareness, education, and citizen involvement in the conservation of marine wildlife and resources; and supports programs for the conservation of marine wildlife and their habitats.

21.     On behalf of its members, CLF has worked to prevent overfishing of Atlantic cod stocks for more than 30 years, and it has advocated extensively on behalf of its members for sustainable management of the species.  CLF has repeatedly and continuously urged NMFS to fulfill its statutory duty to sustainably manage and rebuild overfished Atlantic cod stocks.

22.     CLF first challenged NMFS's failure to prevent overfishing and rebuild several overfished groundfish stocks—including Atlantic cod—in 1991.  *See Conservation Law Found. v. Mosbacher*, 1991 WL 501640 (D. Mass. 1991), *aff'd sub*

*nom. Conservation Law Found. v. Franklin*, 989 F.2d 54 (1st Cir. 1993).  CLF also successfully challenged NMFS's failure to implement the 1996 amendments to the Magnuson-Stevens Act in *Conservation Law Found. v. Evans*, 209 F. Supp. 2d 1 (D.D.C. 2001), requiring the agency to give proper effect to the new legal mandates for bycatch and rebuilding.  More recently, CLF challenged certain catch limits for Gulf of Maine cod, with the court again holding NMFS's action violated the Magnuson-Stevens Act.  *See Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254 (D.D.C. 2014).

23.    CLF's members use and enjoy the ocean for fishing, wildlife observation, boating, research, and study.  CLF's members value and depend on healthy Atlantic cod stocks for these activities.  CLF's members also consume seafood, including Atlantic cod.  CLF's members are directly affected by environmental injury caused by overfishing and unsustainable fishing of Atlantic cod.  Injuries to CLF's members include injuries to their consumption and recreational and commercial use of Atlantic cod populations.

24.    For example, Gilbert Chase is a resident of Northborough, Massachusetts.  In his career, Mr. Chase worked as a fishery research biologist for the U.S. Bureau of Commercial Fisheries (now NMFS), as a biological oceanographer for the U.S. Naval Oceanographic Office, as a marine biologist and division diving officer for the New England Division of the U.S. Army Corps of Engineers, and as an advisor on the Stellwagen Bank National Marine Sanctuary Advisory Board.  As a member of CLF, Mr. Chase is particularly concerned with the

protection of our oceans and marine resources.  As a former fishery research biologist, environmental advocate, consumer of seafood products and citizen of the United States it matters greatly to Mr. Chase how our trust resources are protected and managed.  He stands to be particularly injured if provisions of Framework 59 are allowed to proceed as those provisions will further deplete the already overexploited Atlantic cod stocks.  This harm can only be addressed by remanding Framework 59 and ordering Defendants to stop directing fishing for Atlantic cod and take action to rebuild this iconic species.

25.     Captain William Redington Tower, III is the son of a commercial fisherman and has been the Captain of a commercial fishing vessel and a recreational fisherman for decades.  Currently a resident of Ogunquit, Maine, Captain Tower has worked as a marine biologist and consultant for NMFS and with the Woods Hole Oceanographic Institution studying fish migratory patterns.  A member of CLF since 2013, Captain Tower has been an active supporter of the organization's oceans advocacy, particularly its recent efforts to stop the illegal and unsound management actions being taken with Atlantic cod in Framework 59.  For at least forty years, Captain Tower has owned and operated a charter boat fishing business that commercially fishes for tuna, lobster, and groundfish, including Atlantic cod.  Captain Tower's continuing economic and recreational interests in Atlantic cod stand to be particularly injured by the provisions of Framework 59 as they will further deplete the already overexploited cod stocks in the Gulf of Maine and on Georges Bank.  Only through this Court vacating and remanding these

8

provisions of Framework 59 and directing Defendants to set annual catch limits to rebuild these stocks, will Captain Tower's injuries be redressed.

26.     Peter Shelley is Senior Counsel and a Vice President at CLF.  He has been a member of the organization since 1983.  As an attorney he has worked to protect New England groundfish stocks, including Atlantic cod for more than 30 years.  Mr. Shelley resides in Marblehead, Massachusetts and has been an active recreational fisherman for decades, fishing in the Gulf of Maine and southern New England at least five to six times a year.  Due to NMFS's failure to effectively control the overexploitation of Atlantic cod, the quality and quantity of his saltwater fishing has decreased.  Mr. Shelley's interest in healthy populations of Atlantic cod so that he and his grandchildren can continue to fish for Atlantic cod is injured by Framework 59 because the action will not rebuild the population in as short a time period as possible.  If this Court vacates and remands those portions of Framework 59 that apply to the Gulf of Maine and Georges Bank cod stocks, and orders Defendants to set catch limits consistent with established mechanisms to rebuild these stocks, Mr. Shelley will be able to fish for and catch a healthier and more bountiful supply of Atlantic cod when they are rebuilt.

27.     The aesthetic, conservation, recreational, commercial, cultural, scientific, educational, and other interests of CLF and its members have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely affected and irreparably injured by Defendants' failure to comply with the law in its management of Atlantic cod.  These injuries are actual and concrete

and would be redressed by the relief CLF seeks here.  CLF has no adequate remedy at law.

28.     Defendant Wilbur Ross, United States Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has formal responsibility for the administration and implementation of the Magnuson-Stevens Act, as well as for compliance with all other federal laws applicable to the Department of Commerce.  He is sued in his official capacity.

29.     Defendant NOAA is an agency of the United States Department of Commerce with supervisory responsibility for NMFS.  The Secretary of Commerce has delegated responsibility to implement and enforce compliance with the Magnuson-Stevens Act to NOAA, which in turn has sub-delegated that responsibility to NMFS.

30.     Defendant Chris Oliver, Assistant Administrator for Fisheries, is the highest-ranking official within NMFS and, in that capacity, has direct responsibility for the administration and implementation of the Magnuson-Stevens Act with regard to Atlantic cod, and for compliance with all other federal laws applicable to the agency.  He is sued in his official capacity.

31.     Defendant NMFS is a federal agency within NOAA, in the U.S. Department of Commerce, with the responsibility of protecting and managing the fish, marine mammals, and other marine resources of the United States.  NMFS has been delegated authority by the Secretary of Commerce to implement and enforce the Magnuson-Stevens Act, including approving fishery management plans

and amendments to those plans, and promulgating implementing regulations. NMFS is the government agency primarily responsible for ensuring the requirements of the Magnuson-Stevens Act are followed and enforced, including the requirements to determine the status of managed stocks, identify and rebuild overfished populations of fish, and set annual catch limits to end and prevent overfishing.

## LEGAL BACKGROUND

*The Magnuson-Stevens Act*

32.    Congress enacted the Magnuson-Stevens Act in 1976, in order "to conserve and manage the fishery resources found off the coasts of the United States."  16 U.S.C. § 1801(b)(1).

33.    The Magnuson-Stevens Act establishes eight Regional Fishery Management Councils, including the New England Fishery Management Council ("New England Council"), and tasks them with preparing fishery management plans and recommending regulations to implement the plans.  *Id.* § 1852.

34.    The Secretary of Commerce, acting through NMFS, reviews all submitted plans, plan amendments, and regulations, *id.* § 1854(a)-(b), and upon approval, promulgates regulations and otherwise implements the plans and plan amendments, *id.* §§ 1854(b)(3), 1855(d).

35.    The Magnuson-Stevens Act also provides authority for NMFS to enact emergency regulations, independent of the regular fishery management plan process.  *Id.* § 1855(c).

36.    The Act requires that all fishery management plans, plan amendments, and implementing regulations must be consistent with ten "National Standards" for fishery conservation and management.  *Id.* § 1851(a).

37.    National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ."  *Id.* § 1851(a)(1).  Optimum yield in turn is defined by the Act as the amount of fish that, "in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery."  *Id.* § 1802(33)(C).

38.    The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."  *Id.* § 1802(34).  Regulatory guidelines clarify that "overfishing" refers to the rate of removals from a stock (i.e., the act of fishing at an unsustainable rate), whereas "overfished" refers to a stock having a biomass below which it can produce maximum sustainable yield on a continuing basis.  *See* 50 C.F.R. § 600.310(e)(2)(i).

39.    National Standard 2 requires that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  Other National Standards address coordination, equity, efficiency,

12

contingency planning, costs, fishing communities, bycatch, and safety of human life at sea. *Id.* § 1851(a)(3)-(10).

40.     In addition to the National Standards, the Magnuson-Stevens Act provides direct requirements for fishery management plans. The first and central requirement is that fishery management plans must "contain the conservation and management measures . . . necessary . . . to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A). Fishery management plans also must "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery)." *Id.* § 1853(a)(10).

41.     The Magnuson-Stevens Act also requires the Secretary to take specific actions to rebuild overfished stocks. NMFS must identify fish stocks that are overfished and notify the respective council, as well as publish an annual report listing stocks with an overfished status. *Id.* § 1854(e)(1)-(2). Upon notification, NMFS becomes subject to a mandatory duty to "end overfishing immediately in the fishery and to rebuild affected stocks of fish," which is to be achieved by "prepar[ing] and implement[ing] a fishery management plan, plan amendment, or proposed regulations for the fishery." *Id.* § 1854(e)(3).

42.     Rebuilding, in turn, must take place within a time period that is "as short as possible," generally not exceeding ten years. *Id.* § 1854(e)(4). When

13

rebuilding is underway, NMFS must review progress "at routine intervals that may not exceed two years," to determine whether rebuilding is progressing adequately. *Id.* § 1854(e)(7).

43.     The Act's requirements for fishery management plans reflect the rebuilding mandate, stating that for overfished stocks, plans must "contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery."  *Id.* § 1853(a)(10).

44.     In 2006, Congress amended the Magnuson-Stevens Act to require all fishery management plans to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  Pub. L. No. 109-479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007); 16 U.S.C. § 1853(a)(15).

45.     In regulatory guidelines promulgated under the Act, *see* 16 U.S.C. § 1851(b), NMFS reiterates that mechanisms for specifying annual catch limits must use an "ABC control rule," which is a defined "policy for establishing a limit or target catch level that is based on the best scientific information available," 50 C.F.R. § 600.310(f)(1)(iv).  *See also id.* § 600.310(f)(2) ("The ABC control rule must articulate how ABC [acceptable biological catch] will be set compared to the OFL [overfishing limit] based on the scientific knowledge about the stock or stock complex and taking into account scientific uncertainty.").  The resulting ABC value must account for scientific uncertainty.  *See id.* § 600.310(f)(ii).  Because of their essential purpose, control rules should yield more conservative catch limits as

14

biomass estimates, or other proxies, for a stock or stock complex decline and as scientific and management uncertainty increase.  50 C.F.R. § 600.310(f)(1).

46.     NMFS's regulatory guidelines also elaborate on the statutory requirement for fishery management plans to include objective and measurable status determination criteria.  *Id.* § 600.310(e)(2).  Annual catch limits and accountability measures, in turn, "must prevent overfishing" when measured against the stock's status determination criteria.  *Id.* § 600.310(f)(4)(i).  More broadly, the agency states that "[t]he system of [annual catch limits] and [accountability measures] designed must be effective in protecting the stock or stock complex as a whole."  *Id.* § 600.310(f)(4)(ii).

*The Northeast Multispecies Fishery Management Plan*

47.     The fishery management plan governing the two U.S. stocks of Atlantic cod is the Northeast Multispecies Fishery Management Plan.  *See* New England Fishery Management Council: Management Plans: Northeast Multispecies, https://www.nefmc.org/management-plans/northeast-multispecies.

48.     The Northeast Multispecies Fishery Management Plan was first promulgated in 1986 and it has been amended twenty-one times since its adoption. *See id.*  Plan amendments are generally integrated with environmental review documentation (environmental impact statements or environmental assessments) and are posted on the New England Council's website.  *Id.*

49.    The New England Council takes certain types of actions through "framework adjustments," rather than full plan amendments.  Sixty framework adjustments to the Northeast Multispecies Fishery Management Plan have been made by the Council, including Framework 59, the subject of this lawsuit.  *See id.*

50.    After the plan, plan amendments, and framework adjustments are approved by NMFS, the agency promulgates implementing regulations via the Federal Register.  Implementing regulations for the Northeast Multispecies Fishery Management Plan are codified at 50 C.F.R. Part 648, Subpart F.

51.    The Northeast Multispecies Fishery Management Plan, its amendments and framework adjustments, and the regulations in the Code of Federal Regulations, together create the regulatory structure for management of Atlantic cod and the other groundfish off New England.

*The Administrative Procedure Act*

52.    The APA sets forth basic requirements for federal rulemaking processes, including public notice and opportunity to comment on a proposed rule and required timelines for making a final rule effective.  *See* 5 U.S.C. § 553.

53.    The APA grants the right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action."  *Id.* § 702.  Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

16

54.     An agency action is arbitrary and capricious under the APA "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

55.     The APA also instructs courts to "hold unlawful and set aside" any agency action that is taken "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

56.     The APA further states that courts shall "compel agency action unlawfully withheld or unreasonably delayed."  *Id.* § 706(1).

FACTUAL BACKGROUND

*History of the Cod Fishery*

57.     Humans have fished for Atlantic cod for millennia.  Cod are believed to have driven the expansion of European colonial settlement around the North Atlantic, eventually leading to the Massachusetts Bay Colony and, subsequently, the states of New England.  *See, e.g.*, Mark Kurlansky, Cod: A Biography of a Fish that Changed the World, at 19-29 (1997).

58.     Atlantic cod was a major driver of the regional economy in New England and Eastern Canada.  Early colonial economies depended heavily on cod

17

exports, with important trade routes to Europe and the Caribbean.  *See, e.g.*, Kurlansky, *supra*, at 63-89.

59.     In addition to economic value, the cod fishery has been an enduring source of cultural and historical identity in New England.  Atlantic cod was so important that some of the newly-independent colonies featured cod imagery on their state seals and currencies; a carved wooden cod effigy has hung in the Massachusetts State House for over two centuries.

60.     Atlantic cod also played a key role in the marine ecosystems of the North Atlantic, as a wide-ranging generalist predator.  Present in tremendous numbers, cod provided a major vector for energy transfer from lower to upper trophic levels in benthic ecosystems.  *Cf.* Jason S. Link et al., Trophic Role of Atlantic Cod in the Ecosystem, 9 Fish & Fisheries 1 (2008).

61.     The fishery for Atlantic cod off North America has been prosecuted over the centuries with a variety of fishing technologies—from simple sailing vessels with baited hooks dangling over the sides, to modern steel-hulled and diesel-powered fishing boats that drag large nets across the ocean and use modern electronic technologies to find fish.  *See, e.g.*, W.H. Lear, History of Fisheries in the Northwest Atlantic: The 500-Year Perspective, 23 J. Nw. Atl. Fish. Sci. 41, 44-63 (1998).

62.     Annual removals of Northwest Atlantic groundfish were relatively stable for approximately three centuries, then started increasing toward the late 1800s.  Industrialization of the fleet in the early 20th Century led to a sharp

increase in catches, which became even steeper in the late 1950s with the advent of foreign distant-water fleets. These large factory ships were capable of catching, processing, and freezing at sea tremendous amounts of fish, and they operated just a few miles off the U.S. coastline. At the peak of foreign fishing in the 1960s, Northwest Atlantic groundfish removals reached around 2.5 million metric tons per year, much of which was Atlantic cod. *See* Lear, *supra*, at 62-67.

*Passage of the Magnuson-Stevens Act*

63. After several years of debate and draft legislation, Congress passed the Fisheries Conservation and Management Act (later renamed the Magnuson-Stevens Act) in 1976. *See* Pub. L. No. 94-265, 90 Stat. 331 (Apr. 13, 1976).

64. The law, among other things, declared the United States' sovereignty over a 200-mile offshore zone, and established management authority over all fishery resources within that area. *See* 16 U.S.C. §§ 1811-1812. In combination with this jurisdictional expansion, the law contained a regulatory structure designed to push out foreign fishing vessels. *See id.* §§ 1821-1825.

65. To manage domestic fisheries within the newly-established 200-mile zone, the law established a regional regulatory structure, in which eight regional fishery management councils act as the first movers for management actions, and the Secretary of Commerce (in the form of NMFS) reviews, approves, and implements the actions. *See id.* §§ 1852, 1854.

66.     The New England Council is one of the eight regional councils and was given responsibility for managing fish stocks in federal waters off Connecticut, Rhode Island, Massachusetts, New Hampshire, and Maine. *Id.* § 1852(a)(1). This management responsibility includes the two U.S. stocks of Atlantic cod at issue in this matter.

*Atlantic Cod Collapse*

67.     Following passage of the Magnuson-Stevens Act in 1976, domestic investment in fishing fleets increased, and U.S. fishing capacity skyrocketed. The domestic fleet, eager to exercise its new capacity, effectively picked up where the foreign fleets left off. Fishing pressure on Atlantic cod and other groundfish stocks resumed at high levels, and cod landings in New England reached all-time highs in the late 1970s and early 1980s. *See, e.g.*, Vaughn C. Anthony, The New England Groundfish Fishery after 10 Years under the Magnuson Fishery Conservation and Management Act, 10 N. Am. J. Fish. Mgmt. 175 (1990) (noting a doubling of fishing effort between 1976 and 1983).

68.     The first stock assessment of Atlantic cod under the Magnuson-Stevens Act took place in 1977. It determined that both the Gulf of Maine and Georges Bank cod stocks already were subject to overfishing. *See* Fredric M. Serchuk, Analysis of the Georges Bank and Gulf of Maine Cod Stocks, Woods Hole Lab. Ref. No. 77-24 (Dec. 1977).

69.     NMFS briefly adopted an Interim Groundfish Management Plan for Atlantic cod and other species in 1982, which was replaced by the permanent Northeast Multispecies Fishery Management Plan in 1986. *See* 51 Fed. Reg. 29,642 (Aug. 20, 1986).

70.     Management efforts for Atlantic cod in the 1970s and 1980s were ineffective in the face of a burgeoning U.S. fishing fleet, with their new electronic technologies and higher-horsepower vessels. *See, e.g.*, Steven A. Murawski, NOAA Fisheries, A Brief History of the Groundfishing Industry of New England, https://www.fisheries.noaa.gov/new-england-mid-atlantic/commercial-fishing/brief-history-groundfishing-industry-new-england (noting early federal management used "ineffective controls on net mesh size, closed areas and minimum fish sizes in landings").

71.     In the face of intense overfishing, the abundance of the entire groundfish complex declined by 65 percent in the first ten years of management by NMFS and the New England Council (1977 to 1987). *See* Anthony, *supra*, at 182.

72.     Fishing mortality rates in the 1980s were estimated to have been two to three times the levels associated with maximum sustainable yield. This meant the fishery was removing 50-70 percent of all adult cod each year. *See, e.g.*, R.K. Mayo & L. O'Brien, Atlantic Cod, in NOAA Tech. Mem. NMFS-NE-115, Status of Fishery Resources Off the Northeastern United States for 1998.

73.     Catch of Atlantic cod began to decline in the late 1980s and early 1990s, as the stocks' biomass dwindled under intense overfishing. *See, e.g.*,

21

Northeast Fisheries Science Center, Operational Assessment of 14 Northeast
Groundfish Stocks 36, 45 (Jan. 7, 2020) ("2019 Operational Assessments").  Catch of
Atlantic cod never again reached the levels seen in the 1980s.  *See id.*

74.     Today, some forty years after the first stock assessment under the
Magnuson-Stevens Act and forty-four years after Congress first directed NMFS to
prevent overfishing, the situation has only grown worse: both U.S. cod stocks have
dropped to significantly lower levels of biomass, and remain subject to overfishing.
*See id.* at 24-26.  The "historic lows" in biomass of the 1980s identified at the time of
the early stock assessments now, in hindsight, represent historic highs in the time
period, and the most recently accepted assessment models estimate biomass in both
Atlantic cod stocks to be less than 10 percent of target levels.

*The Sustainable Fisheries Act of 1996*

75.     Congress responded to the continued overfishing and stock collapse of
species like Atlantic cod by passing the Sustainable Fisheries Act of 1996, which
reauthorized and amended numerous provisions of the Magnuson-Stevens Act.  *See*
Pub. L. No. 104-297, 110 Stat. 3559 (Oct. 11, 1996).

76.     The Sustainable Fisheries Act strengthened the conservation
requirements of the Magnuson-Stevens Act to ensure U.S. fisheries were managed
sustainably.

77.     Congress added to the Magnuson-Stevens Act a direct requirement to
rebuild overfished fish stocks, in the Sustainable Fisheries Act.  *See id.* § 109(e), 16

U.S.C. § 1854(e) (requiring Secretary to identify overfished stocks, notify the respective council, and rebuild affected stocks by a date certain).

78.    Congress intended the new rebuilding mandate to bind and commit federal managers to restoring overfished stocks, so as to bring fish populations back to healthy levels and enable sustainable harvest into the future.  *See, e.g.*, S. Rep. No. 104-276, at 5 (May 23. 1996) (explaining that "[a] Council would have one year [later amended to two years] to come up with a plan to stop overfishing and rebuild the fishery, and the Secretary would be required to step in if the Council fails to act"); *see also* 32 Weekly Comp. Pres. Docs. 2040 (Oct. 11, 1996) (signing statement from President Clinton) ("Most important are new measures to prevent our fish stocks from being overfished and to ensure that already depressed stocks are rebuilt to levels that produce maximum sustainable yields from the fisheries.").

*Decades of Failing to Rebuild*

79.    NMFS first implemented the Sustainable Fisheries Act in New England's groundfish fishery in 1999, when it approved Amendment 9 to the Northeast Multispecies Fishery Management Plan.  *See* 64 Fed. Reg. 471 (Jan. 5, 1999).

80.    In its next annual harvest specifications package, however, the New England Council recommended and NMFS approved a management action, Framework Adjustment 33, that explicitly relied on prior, less precautionary, mechanisms for calculating the allowable harvest that were inconsistent with the

terms of Amendment 9.  Because Framework 33 failed to comply with the
Sustainable Fisheries Act, it was invalided in court.  *See Conservation Law Found.*
*v. Evans*, 209 F. Supp. 2d at 18.

81.     NMFS and the New England Council's second attempt to implement
requirements of the Sustainable Fisheries Act came in 2004, with Amendment 13 to
the New England Multispecies Fishery Management Plan.  *See* 69 Fed. Reg. 22,906
(April 27, 2004).

82.     In Amendment 13, NMFS approved formal rebuilding plans for twelve
overfished groundfish stocks, including both stocks of Atlantic cod.  *See* New
England Fishery Management Council, Final Amendment 13 to the Northeast
Multispecies Fishery Management Plan (Dec. 18, 2003); *see also* 69 Fed. Reg. at
22,909, 22,920-21.

83.     Rebuilding plans essentially consist of three elements: a time frame for
rebuilding (i.e., a number of years), a probability of success (i.e., a likelihood that
the stock will actually be rebuilt by the deadline, which must be at least 50
percent), and a fishing mortality rate for rebuilding which is referred to as
"Frebuild" (i.e., a rate of catching fish that, when applied across the rebuilding time
frame, should result in biomass rebuilding to the target level by the end of the time
frame).  The three elements are interrelated, such that a change in one will
inherently involve a change in one or both of the others, and such that when two of
the elements are set, the third is determined as a result.

84.     When setting the time frame for rebuilding Atlantic cod stocks in Amendment 13, the Council recommended and NMFS approved the longest period of years permissible under the law.  For Gulf of Maine cod, the maximum time allowable for rebuilding was 10 years; the Council recommended and NMFS approved 10 years as its rebuilding target.  For Georges Bank cod, the maximum allowable time for rebuilding was 22 years; the Council recommended and NMFS approved 22 years as its rebuilding target.  *See* Amendment 13, at I-34 to I-35.

85.     When these rebuilding periods were approved, the law required, as it does today, that stocks must be rebuilt in "as short [a time] as possible."  16 U.S.C. § 1854(e)(4)(A)(i).

86.     The New England Council's stated rationale for choosing the maximum number of years for rebuilding, instead of a shorter time frame, was:  "the Council believes it appropriate to extend the rebuilding period to mitigate, in part, the economic impacts of the rebuilding programs."  *Id.* at I-34.  NMFS appeared to regard it as a matter for "the Secretary to exercise his discretion" to determine, rather than as being subject to a binding requirement to rebuild in as short a time as possible.  69 Fed. Reg. at 22,920.

87.     Because NMFS approved such long rebuilding timeframes for the Atlantic cod stocks, the fishing mortality rate for rebuilding ($F_{REBUILD}$) was able to be set at or even above the fishing mortality rate corresponding with maximum sustainable yield (referred to as "$F_{MSY}$"), which is generally an upper limit for fishing mortality for a normal healthy stock.  *See* Amendment 13, at I-43 ($F_{REBUILD}$

25

set equal to $F_{MSY}$ for first five years of Gulf of Maine cod rebuilding plan, then reduced marginally); *id.* at I-49 ($F_{REBUILD}$ set above $F_{MSY}$ for first five years of Georges Bank cod rebuilding plan, then set at $F_{MSY}$).

88.    Phrased differently, because NMFS approved such long timeframes for rebuilding Atlantic cod stocks, the harvest rate set for the rebuilding period was able to remain the same as the harvest rate for a healthy stock. *See id.* at I-39.

89.    In 2010, the Council developed and NMFS approved Amendment 16 to the Northeast Multispecies Fishery Management Plan.  Amendment 16 responded to the 2006 amendments to the Magnuson-Stevens Act by creating a mechanism for setting annual catch limits in the fishery to prevent overfishing. *See* 75 Fed. Reg. 18,262 (Apr. 9, 2010).

90.    A core element of the annual catch limit mechanism established by Amendment 16 was a control rule for setting acceptable biological catch ("ABC"), which is a precursor number to the final annual catch limit.  Control rules for setting ABC are referred to as "ABC control rules."  They are defined by NMFS in regulatory guidance, as an aspect of the statutorily-mandated "mechanism for specifying annual catch limits."  16 U.S.C. § 1853(a)(15); *see also* 50 C.F.R. § 600.310(f)(1)(iv), (f)(2).

91.    Control rules are generally applied by a council's Scientific and Statistical Committee ("SSC"), using the best available scientific information (usually the results of the most recent stock assessment) to specify the acceptable biological catch. *See* 50 C.F.R. § 600.310(f)(3).

92.     The ABC control rule established in Amendment 16 was a simple set of options, with conditions triggering the use of each option.  The options are generally referred to as Option A, which reflects the default approach for normal circumstances, Option B and Option C, which increase in stringency for different rebuilding situations, and Option D, which applies in data-limited and other situations:

> a.  ABC should be determined as the catch associated with 75% of $F_{MSY}$.
>
> b.  If fishing at 75% of $F_{MSY}$ does not achieve the mandated rebuilding requirements for overfished stocks, ABC should be determined as the catch associated with the fishing mortality that meets rebuilding requirements ($F_{REBUILD}$).
>
> c.  For stocks that cannot rebuild to $B_{MSY}$ [the stock's biomass target] in the specified rebuilding period even in the absence of fishing, the ABC should be based on incidental bycatch, including a reduction in the bycatch rate (i.e., the proportion of the cod stock caught as bycatch).
>
> d.  Interim ABC's should be determined for stocks with unknown status according to case-by-case recommendations from the SSC.

New England Fishery Management Council, Final Amendment 16 to the Northeast Multispecies Fishery Management Plan, at 78-79 (Oct. 16, 2009) ("Amendment 16"); *see also* 75 Fed. Reg. at 18,265 (describing the ABC control rule).

93.     The Amendment 16 ABC control rule, applicable to all groundfish including Atlantic cod, provided for departures from the options listed above, but only if the availability of better information enables the use of a more precise approach to setting the ABC:

27

> The[] ABC control rule[] will be used in the absence of better
> information that may allow a more explicit determination of scientific
> uncertainty for a stock or stocks.  If such information is available—
> that is, if scientific uncertainty can be characterized in a more accurate
> fashion—it can be used by the SSC to determine ABCs.

*Id.* at 78.

94.     Amendment 16 also updated the $F_{REBUILD}$ values for Gulf of Maine cod and Georges Bank cod, based on the most recent round of stock assessments.  *See id.* at 79, 83-84.  The Council noted: "In the case of [Gulf of Maine] cod . . . , the rebuilding fishing mortality exceeded $F_{MSY}$.  Since fishing at a higher level than $F_{MSY}$ constitutes overfishing, the mortality target for th[is] stock[] was shown as $F_{MSY}$ in the draft amendment."  *Id.* at 79.  This meant that, for Gulf of Maine cod, the rebuilding plan established in Amendment 13 would continue to have absolutely no effect on the amount of annual catch.  *See also id.* at 487.

95.     For Georges Bank cod, the $F_{REBUILD}$ value ended up being almost exactly 75 percent of $F_{MSY}$.  *See id.* at 86.  This meant it was virtually identical to the fishing mortality rate that would have been applied, had the stock been perfectly healthy.  *See id.* at 78-79; 487.  So, for Georges Bank cod too, the rebuilding plan established in Amendment 13 continued to have no meaningful effect on the amount of annual catch.

96.     In December 2011, a new stock assessment was published for Gulf of Maine cod that showed the stock to be in far worse condition than previously estimated.  The results indicated that Gulf of Maine cod was experiencing severe overfishing (fishing mortality rates of more than 5 times the $F_{MSY}$ limit) and was

significantly overfished (biomass at 19 percent of the B$_{MSY}$ target).  *See* Northeast

Fisheries Science Center, 53rd Northeast Regional Stock Assessment Workshop

(53rd SAW) Assessment Report, Ctr. Ref. Doc. 12-05, at 59 (Mar. 2012).

97.    Shortly after the new assessment for Gulf of Maine cod was released,

NMFS formally notified the Council pursuant to 16 U.S.C. § 1854(e)(7) that the

New England Multispecies fishery management plan "ha[d] not resulted in

adequate progress toward ending overfishing and rebuilding of [Gulf of Maine] cod."

NMFS directed the Council to implement "measures that would end overfishing on

the [Gulf of Maine] stock."  Letter from Samuel Rauch, Acting NMFS Assistant

Administrator, to C.M. "Rip" Cunningham, New England Council Chairman

(January 26, 2012).

98.    Despite the dire situation, NMFS explicitly allowed overfishing on Gulf

of Maine cod to continue throughout the 2012 fishing year.  *See* 77 Fed. Reg. 19,944

(Apr. 3, 2012).

99.    In early 2012, an assessment update was published for Georges Bank

cod, among others, showing (as occurred with Gulf of Maine cod) the stock was in

worse condition than previously believed.  The assessment concluded Georges Bank

cod was still subject to overfishing and still overfished.  *See* Northeast Fisheries

Science Center, Assessment or Data Updates of 13 Northeast Groundfish Stocks

through 2010, Ctr. Ref. Doc. 12-06, at 14 (Mar. 2012) (finding Georges Bank cod

biomass at 8 percent of target levels, and fishing mortality at nearly double the

overfishing level).

100.   Based on the 2012 assessment update for Georges Bank cod, NMFS formally notified the New England Council, pursuant to 16 U.S.C. § 1854(e)(2), that the stock was still overfished and continued to be subject to overfishing.  *See* Letter from Daniel S. Morris, Acting NMFS Regional Administrator, to C.M. "Rip" Cunningham, New England Council Chairman (May 30, 2012).

101.   New stock assessments for Gulf of Maine cod and Georges Bank cod were published in 2013.  *See* Northeast Fisheries Science Center, 55th Northeast Regional Stock Assessment Workshop (55th SAW) Assessment Report, Ctr. Ref. Doc. 13-11 (June 2013).  Both stocks were estimated to be at even smaller fractions of their respective biomass targets than had been found in their prior assessments; both stocks were still overfished and were still subject to overfishing.  *See id.* at 25-26, 680.

102.   In late 2013, NMFS formally notified the New England Council pursuant to 16 U.S.C. § 1854(e)(2), based on the latest round of stock assessments, that both Gulf of Maine cod and Georges Bank cod were still overfished and subject to overfishing.  *See* 78 Fed. Reg. 64,480 (Oct. 29, 2013).

103.   In 2014, NMFS approved a new rebuilding plan for Gulf of Maine cod through Framework Adjustment 51.  *See* New England Fishery Management Council, Framework Adjustment 51 to the Northeast Multispecies [Fishery Management Plan] (Feb. 24, 2014) ("Framework 51"); *see also* 79 Fed. Reg. 22,421 (Apr. 22, 2014).

104.    In the time elapsed between the original rebuilding plans set in
Amendment 13 in 2004, and the new rebuilding plan for Gulf of Maine cod set in
Framework 51 in 2014, federal appellate court made clear that the Act's rebuilding
section provided a substantive constraint on the setting of rebuilding time frames,
in the words "as short as possible."  *See* 16 U.S.C. § 1854(e)(4)(A)(i); *Nat. Res. Def.
Council v. NMFS*, 421 F.3d 872, 879-81 (9th Cir. 2005) (holding the statutory "as
short as possible" language requires the councils and NMFS to minimize the time
frame used for rebuilding, regardless of "whatever the[maximum permissible]
length" may be).

105.    Also prior to the Framework 51 rebuilding plan for Gulf of Maine cod,
NMFS had revised its regulatory guidelines and directly stated that rebuilding
plans should avoid using the maximum permissible number of years for rebuilding,
and instead should set a time frame inward of the statutory maximum, in order to
comply with the "as short as possible" language of the Act, and for a number of
other sound policy reasons.  *See* Final Rule, National Standard Guidelines, 74 Fed.
Reg. 3178, 3201 (Jan. 16, 2009) ("$T_{max}$ [i.e., the statutory maximum] is a limit which
should be avoided.").

106.    In Framework 51, the Council recommended and NMFS again
approved the longest possible time frame for rebuilding Gulf of Maine cod, which
was ten years.  *See* Framework 51, at 4; 79 Fed. Reg. at 22,424.

107.    Because the Council recommended and NMFS approved the longest
possible time frame for rebuilding Gulf of Maine cod in Framework 51, the

corresponding $F_{REBUILD}$ rate was again higher than 75 percent of $F_{MSY}$, the default

fishing mortality rate applied to healthy groundfish stocks. *See id.* at 22,424-25.

108.    Because $F_{REBUILD}$ for Gulf of Maine cod under the Framework 51

rebuilding plan was higher than $F_{MSY}$, in subsequent years when the Council

recommended and NMFS approved annual catch limits for Gulf of Maine cod under

the ABC control rule, the stock would use Option A, the default option for healthy

stocks. *See id.* at 22,424 ("[C]atches will continue to be set consistent with the

Council's default control rule . . . .").

109.    Choosing such a long rebuilding time frame, with its correspondingly

high $F_{REBUILD}$ rate, was an intentional decision by NMFS and the Council.  No

rebuilding time frame was even considered for Gulf of Maine cod in Framework 51

that would have reduced the fishing mortality rate below the default Option A value

of 75 percent of $F_{MSY}$. *See id.* at 22,424 (admitting that "all of the rebuilding

strategies considered in Framework 51 for [Gulf of Maine] cod . . . were calculated

using an $F_{REBUILD}$ that was greater than 75% $F_{MSY}$.").

110.    As such, the Framework 51 rebuilding plan for Gulf of Maine cod had

no effect on the annual management of the stock in subsequent years.

111.    In late 2014, a new stock assessment update was published for Gulf of

Maine cod, showing the stock's status, again, to be worse than previously believed.

*See* Michael C. Palmer, 2014 Assessment Update Report of the Gulf of Maine

Atlantic Cod Stock, Ctr. Ref. Doc. 14-14 (Oct. 2014).  Biomass was estimated to be 3

or 4 percent of target levels, and fishing mortality rates were determined to be

around seven times the sustainable level.  *See id.* at 6.  The stock was determined to still be overfished, and still subject to overfishing.  *Id.*

112.   Based on the new stock assessment results, NMFS sent a letter to the Council in late 2014, "urg[ing] the Council to take meaningful and timely actions for Gulf of Maine (GOM) cod" following the 2014 stock assessment update, which found "that the GOM cod stock is overfished, subject to overfishing, and in very poor overall condition."  *See* Letter from John K. Bullard, NMFS Regional Administrator, to E.F. "Terry" Stockwell III, New England Council Chair (Sept. 25, 2014).  NMFS did not, however, make a finding of inadequate rebuilding progress under 16 U.S.C. § 1854(e)(7) for the stock.

113.   In early 2015, NMFS formally notified the New England Council, pursuant to 16 U.S.C. § 1854(e)(2) and (7), that based on the 2014 stock assessment, that Gulf of Maine cod was still overfished and subject to overfishing, and stated that the Council "must end overfishing and rebuild this stock."  80 Fed. Reg. 12,621 (Mar. 10, 2015).

114.   At the end of 2015, a new round of stock assessments was completed.  *See* Northeast Fisheries Science Center, Ref. Doc. No. 15-24: Operational Assessment of 20 Northeast Groundfish Stocks, Updated Through 2014 (Nov. 2015).  The results showed that Gulf of Maine cod was still overfished and subject to overfishing.  *Id.* at 11.

115.   For Georges Bank cod, the 2015 assessment update was rejected during peer review, and therefore not used for management purposes.  *Id.* at 36, 39-

33

40.  Instead, the Operational Assessment Panel recommended, and the SSC and NMFS approved, using a data-limited method for setting catch limits for the stock. No overfishing determination was made for Georges Bank cod based on the 2015 assessment, but its status was determined to still be overfished based on qualitative information.  *Id.* at 39 ("All information available in the update assessment indicates that stock size has not increased.").

116.  In 2017, NMFS notified the Council in a letter that, based on the 2015 operational assessments, Gulf of Maine cod and Georges Bank cod were overfished, the former was subject to overfishing, and the latter had an unknown overfishing status.  NMFS wrote: "This letter serves as official Council notification of our determinations under sections 304(e)(2) and (7) of the Magnuson-Stevens Fishery Conservation and Management Act."  Letter from John Bullard, NMFS Regional Administrator, to John F. Quinn, New England Council Chairman (Aug. 31, 2017).

117.  Shortly thereafter, NMFS finalized and published new 2017 operational stock assessments, which confirmed yet again that Gulf of Maine cod was subject to overfishing and was overfished.  *See* Northeast Fisheries Science Center, Operational Assessment of 19 Northeast Groundfish Stocks, Ctr. Ref. Doc. 17-17 (Oct. 2017).  For the Georges Bank cod stock, the same data-limited approach was used, which did not quantitatively determine status; an overfished designation was still recommended due to the generally poor stock condition.  *Id.* at 38.

118.  In 2018, NMFS published a Federal Register notice based on the 2017 operational assessments of their determination that "[p]ursuant to section 304(e)(2)

34

of the Magnuson-Stevens Fishery Conservation and Management Act," Gulf of
Maine cod and Georges Bank cod were both overfished and subject to overfishing.
83 Fed. Reg. 9298 (Mar. 5, 2018).

119.    The most recent round of stock assessments was conducted in 2019,
and concluded that both stocks of Atlantic cod have been subject to overfishing for
all of the years analyzed (1982-2018 for Gulf of Maine cod, and 1978-2011 for
Georges Bank cod), and both stocks have been overfished, meaning biomass was
below the minimum threshold, in all but two years of those same time periods.  *See*
2019 Operational Assessments, *supra* para. 73, at 33.

120.    The operational assessments from 2019 currently are the best
scientific information available.

*Framework 59*

121.    Framework Adjustment 59 to the Northeast Multispecies Fishery
Management Plan is the latest action developed by the New England Council and
approved and implemented by NMFS.

122.    Framework 59 was initiated by the New England Council at its
meeting in June 2019, for the purpose of, among other things, setting catch limits
for fifteen groundfish stocks for fishing years 2020-2022.

123.    The catch limits set in Framework 59 represented NMFS and the New
England Council's management response to recently-completed operational
assessments from 2019.  *See, e.g.*, 85 Fed. Reg. at 45,794 ("This action is necessary

to respond to updated scientific information . . . .”); Framework 59, at 178

(“Alternative 2 [the alternative selected] would reflect the results of the 2019

groundfish operational assessments.”).

124.    After several rounds of drafting and analysis by the Council’s Plan

Development Team and its SSC, the full Council voted on the contents of

Framework 59 at its December 2019 meeting.  The package was finalized and sent

to NMFS for review in April 2020, prior to the May 1 start of the fishing year.

125.    Framework 59 set catch limits for Gulf of Maine cod based on Option A

from the Amendment 16 ABC control rule: 75 percent of $F_{MSY}$.  Option A is intended

to apply to normal situations when a stock is healthy.  *See supra* para. 92.  Option A

sometimes is referred to as the “default control rule.”  *See* Amendment 16, at 487.

126.    Scientific modeling conducted during the Framework 59 process, based

on the 2019 operational assessment for Gulf of Maine cod, showed the stock

had a zero to one percent chance of rebuilding by 2024, its current rebuilding

deadline, even if there were no fishing taking place.

127.    A minority report from the Council’s SSC pointed out that under these

circumstances, the ABC control rule required Option C to be used to set catch limits

for Gulf of Maine cod, since the stock had no meaningful chance of rebuilding by its

deadline even in the absence of fishing.  *See* Memorandum from SSC to Tom Nies,

New England Council Executive Director, at 13 (Nov. 22, 2019), reprinted in

Framework 59, Appendix I; *see also supra* para. 92 (control rule).

36

128.    Option C involves setting catch limits based on bycatch only, including a reduction in bycatch.  *See* Amendment 16, at 78-79.  Option C would have yielded lower annual catch limits for Gulf of Maine cod, had it been applied.  See Memorandum, *supra* para. 127, at 13.

129.    The majority recommendation from the Council's SSC provided no substantive justification in its report for the choice to apply Option A to Gulf of Maine cod, rather than Option C.

130.    The New England Council adopted the majority recommendation from the SSC and set catch limits for Gulf of Maine cod in Framework 59 based on Option A.  The Council provided no substantive justification for this choice in the documentation accompanying Framework 59, other than the fact that the SSC recommended it.

131.    NMFS subsequently provided no further justification when it approved the decision to set Gulf of Maine catch limits based on Option A, other than the fact that the Council and its SSC had selected it.

132.    Framework 59 contained no other conservation and management measures applicable to Gulf of Maine cod that serve, in a meaningful way, to "rebuild the [] stock."  16 U.S.C. § 1854(e)(3).

133.    For Georges Bank cod, Framework 59 set catch limits for fishing years 2020-2022 based on a data-limited approach referred to as "PlanBsmooth."

134.    PlanBsmooth was used as the basis for setting catch limits for the Georges Bank cod stock in the previous two cycles of harvest specifications, namely Framework Adjustment 55 and Framework Adjustment 57.

135.    Neither the Council, its SSC, nor NMFS, in the current harvest specification cycle or in previous cycles, has ever shown that PlanBsmooth will rebuild (or has at least a 50 percent likelihood of rebuilding) Georges Bank cod by its deadline of 2026.

136.    The 2019 operational assessments showed declining indices of abundance for Georges Bank cod, indicating that the use of PlanBsmooth for the past several years has not, in fact, led to rebuilding of the stock—but rather to a further decline in the stock's biomass.  *Cf.* Framework 59, at 177-78 (stating, with no rational support and in the face of facts to the contrary, that "the proposed ABCs are not expected to lead to declines in biomass for the[] stocks" using data-limited methods like PlanBsmooth).

137.    In Framework 59, the New England Council's SSC chose to use the PlanBsmooth results for Georges Bank cod as the ABC, rather than in past actions such as Framework 55 and Framework 57, when it used the PlanBsmooth results for Georges Bank cod as the higher overfishing limit ("OFL"), not the ABC.  *See* Memorandum, *supra* para. 127, at 4.

138.    The net effect of this change was to remove the buffer accounting for scientific uncertainty, making the new Georges Bank cod catch limits less precautionary than in past actions.  Specifically, the change resulted in annual

38

catch limits for Georges Bank cod that are 25 percent higher than they would have been if the PlanBsmooth results had been used to specify the OFL, as was done in the past.  *See id.* at 12.

139.    A majority of the SSC stated this change was made for Georges Bank cod so as to be consistent with how they used PlanBsmooth results for other stocks. The SSC majority provided no further rationale for the change and provided no justification for effectively eliminating the scientific buffer by eliminating the prior buffer provided between the OFL and the ABC calculation.  *See id.* at 9.

140.    A minority of the SSC "opposed [] the process used for setting ABC for Georges Bank cod," and stated the PlanBsmooth output should continue to be used as the stock's OFL.  The minority expressed concern "that the approach recommended by the majority of the SSC removes a crucial buffer that is used for other stocks and previously for this stock."  *Id.* at 13.

141.    The SSC majority also did not explain how the choice to leave the OFL value undefined was consistent with the Act's mandate to "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished."  16 U.S.C. § 1853(a)(10).

142.    The SSC also did not provide an explanation as to why this change was advisable, necessary, logical, or consistent with the Act's catch limit and rebuilding mandates, given that it leads to a relative increase in catch for a stock that already appeared to be declining under the use of this PlanBsmooth approach.

143.    Simply accepting the SSC's recommendation, neither the Council nor NMFS provided any further substantive rationale for deciding to use the PlanBsmooth output as an ABC for Georges Bank cod in Framework 59.

144.    Framework 59 contained no other conservation and management measures applicable to Georges Bank cod that serve, in a meaningful way, to "rebuild the [] stock."  16 U.S.C. § 1854(e)(3).

145.    NMFS received Framework 59 and published the Council's recommendations for public comment on May 29, 2020.  *See* 85 Fed. Reg. 32,347.  NMFS provided 17 days for public comment on the action.  *Id.*

146.    CLF submitted a letter on behalf of its members in response to the proposed rule on June 15, 2020, urging NMFS to disapprove the measures for Atlantic cod.  CLF pointed out that the catch limits proposed for Gulf of Maine cod and Georges Bank cod could not rebuild the stocks by their statutory deadlines, were of limited use as they had no effective accountability mechanism, and were inconsistent with the existing rebuilding plans and the approved ABC Control Rule in the groundfish fishery management plan, which required NMFS to set catch limits based on bycatch only and reduce such bycatch under Option C.

147.    NMFS approved Framework 59 and published a final rule implementing it on July 30, 2020.  *See* 85 Fed. Reg. at 45,794.

148.    In the final rule, NMFS acknowledged CLF's comment letter but provided no meaningful response.  The agency argued that the catch limits for Atlantic cod set in Framework 59 "are consistent with the current rebuilding

40

programs," even though they fail to rebuild the stocks by the deadlines in their respective rebuilding programs.  *Id.* at 45,804.  NMFS provided no direct explanation for ignoring Option C in the ABC control rule for Gulf of Maine cod.  *See id.*  And the agency provided no rational basis for using the PlanBsmooth output as an ABC rather than OFL for Georges Bank cod.  *See id.*

149.    NMFS's approval of Framework 59 and publication of the Framework 59 final rule is a final agency action subject to review under the Magnuson-Stevens Act and the APA.  16 U.S.C. § 1855(f); 5 U.S.C. § 704.

## CAUSES OF ACTION

### COUNT I:  FRAMEWORK 59 VIOLATES THE MAGNUSON-STEVENS ACT AND THE APA WITH RESPECT TO GULF OF MAINE COD

150.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

151.    NMFS has a mandatory duty to rebuild overfished fisheries consistent with 16 U.S.C.§ 1854(e).

152.    The Gulf of Maine stock of Atlantic cod was overfished at the time the Sustainable Fisheries Act was passed in 1996, over two decades ago.  The stock is currently in its second formal rebuilding plan.

153.    NMFS found that its first rebuilding plan failed to produce adequate progress toward rebuilding Gulf of Maine cod, and has repeatedly found that the stock remains overfished under both rebuilding plans.

154.    The current rebuilding plan for Gulf of Maine cod was established by Framework 51 in 2014.

155.    The deadline for rebuilding Gulf of Maine cod is the year 2024.

156.    The rebuilding plan is implemented through biennial harvest specification packages based on periodic stock assessments.

157.    Framework 59 is the most recent specifications package and is based on the 2019 operational assessments.  Framework 59 establishes catch limits and management measures for Gulf of Maine cod for fishing years 2020-2022 and implements existing rebuilding plans for overfished stocks.

158.    Based on the latest stock assessment, there is a zero to one percent chance of Gulf of Maine cod rebuilding by the year 2024, even if fishing were to wholly cease on the stock.

159.    Under the catch limits established in Framework 59, Gulf of Maine cod cannot rebuild by 2024.

160.    Framework 59 furthermore sets catch limits for Gulf of Maine cod using an inapplicable ABC control rule option that should only be applied to healthy stocks, instead of using a control rule option that applies to stocks severely behind schedule with rebuilding—as is the case with Gulf of Maine cod.

161.    Framework 59 fails to contain any other rebuilding measures for Gulf of Maine cod, despite the New England Council having been notified repeatedly (most recently in 2018 and 2020) of the stock's overfished status under 16 U.S.C. § 1854(e)(2).

42

162.   NMFS's approval of Framework 59 and promulgation of the Framework 59 Final Rule, relative to Gulf of Maine cod, violated the legal requirements in the Magnuson-Stevens Act to "rebuild affected stocks of fish," 16 U.S.C. § 1854(e)(3), to use the best available science, *id.* § 1851(a)(2), and to have a functioning mechanism for specifying annual catch limits, *id.* § 1853(a)(15), as well as the APA.

163.   This violation of the Magnuson-Stevens Act by NMFS threatens CLF and its adversely affected members with irreparable injury for which it has no adequate remedy at law.

### COUNT II:  FRAMEWORK 59 VIOLATES THE MAGNUSON-STEVENS ACT AND THE APA WITH RESPECT TO GEORGES BANK COD

164.   Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

165.   NMFS has a mandatory duty to rebuild overfished fisheries consistent with 16 U.S.C.§ 1854(e).

166.   The Georges Bank stock of Atlantic cod was overfished at the time the Sustainable Fisheries Act was passed in 1996, over two decades ago.

167.   Georges Bank cod is currently in a rebuilding plan established by Amendment 13, in 2004.

168.   NMFS has repeatedly found that Georges Bank cod remains overfished, despite being under a rebuilding plan.

169.   The deadline for rebuilding Georges Bank cod is the year 2026.

170.    The rebuilding plan is implemented through biennial harvest specification packages based on periodic stock assessments.

171.    Framework 59 is the most recent such implementing action and is based on the 2019 operational assessments.  Framework 59 establishes catch limits and management measures for Georges Bank cod for fishing years 2020-2022.

172.    Framework 59 bases catch limits for Georges Bank cod, and, in turn, its implementation of the stock's rebuilding plan, on the output of a data-limited methodology utilizing population survey indices.

173.    The data-limited methodology used to set catch limits for, and rebuild, Georges Bank cod has never been demonstrated to rebuild the stock by its statutory deadline of 2026.  To the contrary, U.S. and Canadian survey indices for Georges Bank cod show a recent decline in biomass, indicating the stock is becoming further overfished rather than rebuilding.

174.    Framework 59 furthermore arbitrarily changes its treatment of the data-limited methodology outputs, relative to past actions, such that the resulting catch limits become higher and less precautionary, do not account for scientific uncertainty, and leave the annual overfishing status determination criterion for Georges Bank cod undetermined—without providing any reasoned explanation of how this approach will promote sustainability of the stock, prevent overfishing, and rebuild the stock.

175.    Framework 59 fails to contain any other rebuilding measures for Georges Bank cod, despite the New England Council having been notified

44

repeatedly (most recently in 2018 and 2020) of the stock's overfished status under 16 U.S.C. § 1854(e)(2).

176.    NMFS's approval of Framework 59 and promulgation of the Framework 59 Final Rule, relative to Georges Bank cod, violated the legal requirements in the Magnuson-Stevens Act to "rebuild affected stocks of fish," 16 U.S.C. § 1854(e)(3), to use the best available science, *id.* § 1851(a)(2), to have a functioning mechanism for specifying annual catch limits, *id.* § 1853(a)(15), and to have objective and measurable criteria for determining when the stock is subject to overfishing, *id.* § 1853(a)(10), as well as the APA.

177.    This violation of the Magnuson-Stevens Act by NMFS threatens CLF and its adversely affected members with irreparable injury for which it has no adequate remedy at law.

PRAYER FOR RELIEF

WHEREFORE, CLF respectfully requests the Court enter judgment for Plaintiff providing the following relief:

1.    Declare that Defendants violated the Magnuson-Stevens Act and the APA as described above, when they approved and implemented the Framework 59 conservation and management measures for Gulf of Maine cod.

2.    Declare that Defendants violated the Magnuson-Stevens Act and the APA as described above, when they approved and implemented the Framework 59 conservation and management measures for Georges Bank cod;

45

3.    Order and enjoin Defendants to take emergency action to establish ABCs for the Gulf of Maine and Georges Bank cod stocks based on incidental bycatch only, consistent with Option C of the approved control rule for the Northeast Multispecies Fishery Management Plan.

4.    Order and enjoin Defendants, within six months of the Court's order, to implement additional or revised management measures necessary to achieve adequate progress toward rebuilding Gulf of Maine cod by 2024 and Georges Bank cod by 2026;

5.    Retain jurisdiction over this matter until such time as Defendants have fully complied with the Court's order;

6.    Grant Plaintiff the costs of suit, including reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

7.    Grant such other relief as the Court deems just and proper.


Dated:  August 28, 2020                         Respectfully submitted,

                                                */s/ Erica Fuller*_____
                                                Erica Fuller (D.D.C. Bar No. MA001)
                                                Peter Shelley (*pro hac vice* pending)
                                                Conservation Law Foundation
                                                62 Summer Street
                                                Boston, Massachusetts 02110
                                                (617) 850-1754
                                                efuller@clf.org
                                                pshelley@clf.org

                                                *Counsel for Plaintiff*
                                                *Conservation Law Foundation*